**SO ORDERED.**

**SIGNED this 14 day of March, 2007.**



_____
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

ADVANTAGE PROPERTIES, INC.,

DEBTOR.

CASE NO. 06-12363-11
CHAPTER 11

**OPINION DETERMINING THAT EMPRISE BANK'S MOTION TO DISMISS**

**SHOULD BE GRANTED, WHICH MAKES ITS MOTION**

**FOR STAY RELIEF MOOT**

This matter was before the Court for an evidentiary hearing on February 12, 2007, on creditor Emprise Bank's motion to dismiss, and its alternative motion for stay relief. Emprise appeared by counsel Karl R. Swartz. The Debtor appeared by counsel D. Michael Case. The United States Trustee supported Emprise's motion to dismiss, and

appeared by counsel Richard A. Wieland. The Court heard the evidence and counsel's arguments, and took the matter under advisement.

Debtor Advantage Properties, Inc., owns a strip shopping mall in Wichita, Kansas. In August 2002, the Debtor signed a note to Emprise showing a debt of over $566,000 that was secured by mortgages on the mall. By 2003, the Debtor had defaulted on the debt, and Emprise filed a foreclosure action in state court. Emprise obtained a foreclosure judgment, but in August 2003, on the day before a foreclosure sale was to occur, the Debtor filed a Chapter 11 bankruptcy petition, Case No. 03-14509 ("the First Bankruptcy Case"). Eventually, in January 2005, the Debtor obtained confirmation of a plan of reorganization under which it would pay Emprise $575,000 on its secured claim. The Debtor defaulted on its plan payments, and Emprise accelerated the debt, as allowed by the plan. Emprise returned to state court and a new foreclosure sale was scheduled in December 2006. The day before the sale was to occur, the Debtor filed its second Chapter 11 petition, Case No. 06-12363 ("the Second Bankruptcy Case"). Less than ten days later, Emprise filed a motion to dismiss the new case and a motion for stay relief, seeking authority to complete its foreclosure sale in the state court suit. As explained below, the Court concludes the Second Bankruptcy Case must be dismissed because it constitutes an attempt to modify the Debtor's confirmed and substantially consummated plan in the First Bankruptcy Case that is not permissible because no extraordinary change of circumstances occurred that would justify the new Chapter 11 case. That conclusion renders Emprise's motion for stay relief moot.

2

Case 06-12363    Doc# 43    Filed 03/14/07    Page 2 of 11

**FACTS**

Debtor Advantage Properties, Inc., owns a strip shopping mall ("the Strip Mall") in Wichita that contains seven spaces it rents to commercial tenants. The Strip Mall occupies real property identified by four lot numbers. Over several years, the Debtor borrowed money from Emprise Bank, giving mortgages on the lots as security. In August 2002, the Debtor executed a note showing it then owed Emprise a little over $566,000. The Debtor had also given Emprise an assignment of the rents generated by the Strip Mall, along with a security interest in its fixtures and general intangibles. The Debtor is owned by Gregory Barnes, who was also its only officer until fairly recently.

The Debtor defaulted on its debt to Emprise, and in March 2003, the bank filed a foreclosure action in a Kansas state court. The same attorney represented both the Debtor and Gregory Barnes in that suit. On July 8, 2003, a judgment was entered that granted Emprise's request to foreclose its mortgages on the Strip Mall. The Debtor's attorney approved the form of the judgment. A sheriff's sale was scheduled to be held during the next month, but on the day before it was to take place, the Debtor filed a Chapter 11 petition which became the First Bankruptcy Case. At that time, the debt to Emprise was about $580,000.

In the First Bankruptcy Case, the Debtor initially proposed to pay $470,000 on Emprise's secured claim, but the bank objected. At a hearing in May 2004, the parties agreed Emprise would be paid $575,000, and the plan was confirmed. However, the Debtor subsequently refused to authorize its attorney to approve an order confirming the

plan, and in June, the attorney was allowed to withdraw. In August, a new attorney entered his appearance for the Debtor. In September, the Debtor filed an amended plan that would still pay $575,000 on Emprise's claim on terms essentially the same as those that had been announced to the Court in May. The terms included an interest rate that would be adjusted annually. Emprise did not object, and an order confirming the amended plan was entered in January 2005. Besides Emprise's claim, the only other claims provided for by the plan were tax claims owed to the county, the IRS, and the Kansas Department of Revenue. A final decree was entered the following September.

When the First Bankruptcy Case was filed, the Debtor owed back real estate taxes on the Strip Mall for the tax years from 1999 through the first half of 2004. The Debtor's amended plan stated the county's allowed claim for those taxes was just over $50,000, and was secured by a lien on the Strip Mall. The plan said the claim was currently the subject of an abatement request, and the amount not abated would be paid over six years. The plan also said the Debtor would pay all future real estate taxes, beginning with the second half of the 2004 taxes, as they came due. So far as the people now involved can determine, the Debtor did not actually request an abatement until about three and a half months after its amended plan was confirmed. The abatement request the Debtor submitted in May 2005 referred to only one of the four lots that make up the Strip Mall, but covered most of the taxes the Debtor owed because the taxes on that lot were much higher than those on the other three. The Debtor asked to have the taxes on that lot reduced from about $63,500 (an amount that included the second half of the 2004 taxes)

4

to $5,000. For unknown reasons, the governmental unit reviewing the abatement request has not yet acted on it.

According to the county' records, as of February 1, 2007, the Debtor still had not paid the second half of the taxes for 2004 on any of its lots, and had not paid any of the taxes for 2005 on three of its four lots, although it did pay nearly all of the tax due on the most highly-taxed lot. According to the Court's calculations, for the second half of the 2004 tax year and the full 2005 tax year, the Debtor has failed to pay a total of over $9,000 in real property taxes, not including interest and fees the county has imposed because the Debtor has not paid the taxes. When the Debtor filed the Second Bankruptcy Case, the first half of its taxes for 2006 would not become due for about two weeks. More than a month after the taxes became due, the county's records showed that none of the first half of the Debtor's 2006 taxes, nearly $9,000, had been paid.

When the plan was confirmed in the First Bankruptcy Case, the interest rate the Debtor had to pay Emprise was 8.25%, and its monthly payments were a little over $4,300. In January 2006, when the rate was adjusted for the first time, it went up to 10.25% and the monthly payments went up to over $5,000. According to Emprise, the Debtor failed to make the March 2006 payment on time and failed to cure the default timely after notice from Emprise. The Debtor later paid most of the March and April payments, but was still about $400 behind as of May 1. When the Debtor failed to make the regular May payment on time, Emprise accelerated the entire debt. After that, on the advice of counsel, Emprise refused to accept from the Debtor any payment of less than

5

the full amount of the accelerated debt. The Debtor presented no evidence to refute Emprise's evidence of payment defaults.

Early in June 2006, Emprise sent a letter to the tenants of the Strip Mall telling them to begin paying their rent to Emprise instead of the Debtor. The Debtor contends this letter caused confusion among its tenants, and led to the loss of two tenants. Emprise has reported that only one tenant paid rent to it. The Debtor has indicated another tenant told the Debtor's representative that it was paying rent to Emprise when it was not.

Late in July 2006, there was a fire in one of the spaces in the Strip Mall. The tenant that had been in that space eventually left, although it is not clear whether either the fire or Emprise's letter caused the tenant to leave. The fire damage was repaired with insurance proceeds. The repair work was finished in January 2007.

In September 2006, Emprise returned to the state court and filed a motion for an order authorizing it to sell the Strip Mall. That same month, Mr. Barnes filed a motion in the First Bankruptcy Case, alleging the Debtor had not defaulted on its plan and asking the Court to stay Emprise's state court suit. He also claimed the Debtor had about $250,000 of equity in the Strip Mall. At a hearing in the state court early in October on Emprise's sale motion, Mr. Barnes appeared but no attorney appeared for the Debtor. The state court ruled the Debtor had not properly appeared, and granted Emprise's motion. A short time later, Chief Judge Nugent held a hearing on Mr. Barnes's motion in the First Bankruptcy Case. Mr. Barnes appeared personally and an attorney appeared for the Debtor. Judge Nugent denied the motion.

6

Case 06-12363    Doc# 43    Filed 03/14/07    Page 6 of 11

In November 2006, an order of sale was entered in the state court case, and Emprise scheduled a sheriff's sale for December 6. The Debtor filed the Second Bankruptcy Case the day before the sale was to take place, so the automatic stay stopped the sale from happening. Mr. Barnes signed the bankruptcy petition as the Debtor's president. The Debtor reported it owed Emprise $570,000, but that the Strip Mall securing the debt was worth just $450,000. The only other debts listed on the Debtor's schedules were the real estate taxes and a $130,000 unsecured debt to a company called Cortez, Inc.[1] The Debtor reported it had tenants in five of its seven rental spaces on the petition date. Less than ten days after the petition was filed, Emprise filed a motion to dismiss and a motion for stay relief.

On January 3, 2007, the U.S. Trustee filed a response to Emprise's motion to dismiss. The UST reported her office had asked the Debtor to complete an Initial Financial Report and Affidavit by December 26, but the Debtor had not met that deadline. The UST also reported her office had held an initial debtor interview with the Debtor, and learned the Debtor's insurance coverage for the Strip Mall was being cancelled. The Debtor later supplied proof it had obtained replacement insurance. By the time of the

---

[1]The Court has discovered that the unsecured debt to Cortez was added to the schedules in the First Bankruptcy Case before the plan was confirmed. The plan provided that an unsecured claim owed to the IRS would be paid, but that no other unsecured claims would be paid. The debt to Cortez would have been discharged by confirmation of the plan, *see* 11 U.S.C.A. § 1141(d)(1)(A), unless Cortez did not get proper notice of the plan and confirmation hearing, *Reliable Electric Co. v. Olson Constr. Co.*, 726 F.2d 620, 622-23 (10th Cir. 1984). The Court also notes that the mailing address reported in the Debtor's schedules for Cortez, Inc., "2251 M. Dellrose St., Wichita KS 67220" is essentially the same as the mailing address shown for the Debtor on the county's real estate tax records, "2251 N. Dellrose, Wichita KS 67220-2904" so they are likely to be related companies. However, none of the parties based any arguments on either the debt owed to Cortez or Cortez's relationship to the Debtor.

hearing on Emprise's motion, the UST had decided to support the motion. The UST reported that as of February 12, the Debtor had not filed an operating report for December, and still had not filed the Initial Financial Report.

The meeting of the Debtor's creditors required by § 341(a) of the Bankruptcy Code was set for January 12, 2007, but on January 3, Mr. Barnes was incarcerated for a probation violation. Since then, his wife, Ginger Barnes, has gotten involved in trying to run the Debtor's business. In January, Mr. Barnes appointed her as an officer of the Debtor so she could act on its behalf. Apparently, though, either she did not have access to the Debtor's business records or Mr. Barnes did not keep adequate records, because she had to take steps to obtain records from Emprise to help her run the business. Mrs. Barnes's testimony indicated she did not know much about what had gone on in the Debtor's business before she became involved in January 2007. She also indicated she was setting up ledger books and taking other steps to get the business more organized.

**DISCUSSION**

For Chapter 11 cases like the Debtor's First Bankruptcy Case, § 1141(a) of the Bankruptcy Code declares that "the provisions of a confirmed plan bind the debtor." Section 1127(b), though, allows the proponent of a plan or the reorganized debtor to modify the plan after confirmation but before "substantial consummation" of the plan. "Substantial consummation" is defined in § 1101(2) to mean:

>   (A) transfer of all or substantially all of the property proposed by the plan to be transferred;

8

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

As explained in *In re Adams*, these provisions establish that once a plan has been substantially consummated, "the debtor should not be able to circumvent or evade its binding responsibilities by filing what is in effect a modified plan."[2] On the other hand, since there is no *per se* prohibition against filing a new case after substantial consummation of a confirmed plan, courts have permitted a debtor to file a subsequent bankruptcy reorganization case when the debtor can prove it is acting in good faith by showing an extraordinary change of circumstances has occurred after substantial consummation that has created a genuine need for it to file its second case.[3] Only changes that were not anticipated and not reasonably foreseeable before the confirmed plan in the first case was substantially consummated can justify the second reorganization attempt.[4]

In this case, the Debtor has failed to demonstrate that it acted in good faith in filing the Second Bankruptcy Case. The Debtor's confirmed plan provided that it would pay Emprise interest at an adjustable rate, so the potential for the rate to increase as it did in January 2006 was clearly anticipated by the time of confirmation. Nevertheless, within a

---

[2] 218 B.R. 597, 600 (Bankr. D. Kan. 1998).

[3] *Id*. at 601.

[4] *Id*; *see also In re Tillotson*, 266 B.R. 565, 568-70 (Bankr. W.D. NY 2001) (quoting with approval *Adams*'s explanation of good faith requirement courts have imposed on bankruptcy reorganization case filed after substantial consummation of prior confirmed plan).

9

few months of the rate increase, the Debtor defaulted on its payments to Emprise. Furthermore, the Debtor had already defaulted on its obligations under the plan and increased the risk to Emprise's secured position by failing to pay the real property taxes on the Strip Mall according to the plan's terms. At least $9,000 worth of real property taxes were not paid as called for by the plan, and any interest and fees the county has imposed have further eroded Emprise's position.

The Debtor's evidence suggested only three possible changes in circumstances that might be thought to justify its Second Bankruptcy Case. First, there was a fire in one of the rental spaces in the Strip Mall. Second, Emprise allegedly confused the Debtor's tenants by telling them in the summer of 2006 to start paying their rent to Emprise instead of the Debtor. Third, Mrs. Barnes has now taken over the Debtor's operations, and promises to be able to run the business more effectively than her husband has. After giving these matters careful consideration, the Court concludes they are not enough to justify the Debtor's Second Bankruptcy Case. The first two events both occurred after the Debtor defaulted on obligations under its plan to pay Emprise and to pay post-confirmation real property taxes as they came due, so the most they could explain is the Debtor's failure to cure its defaults, not the defaults themselves. Mrs. Barnes's efforts to straighten out the Debtor's business are commendable, but the Court believes her post-petition activities simply come too late. Furthermore, since her husband still owns all the stock of the Debtor, she would not have the authority to maintain her control of the Debtor if he should decide to resume control in the future.

10

The Court is convinced that, after the Debtor's plan in the First Bankruptcy Case was confirmed and substantially consummated, no extraordinary change in the Debtor's circumstances occurred that created a genuine need for it to file the Second Bankruptcy Case. Consequently, the Second Bankruptcy Case constitutes an impermissible attempt by the Debtor to modify the plan confirmed in the First Bankruptcy Case. This means the Second Bankruptcy Case must be dismissed. The dismissal will terminate the automatic stay,[5] making Emprise's motion for stay relief moot.

**CONCLUSION**

For these reasons, the Court concludes Emprise Bank's motion to dismiss the Debtor's Second Bankruptcy Case must be granted. Dismissal of the case will render Emprise's motion for stay relief moot.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by FRBP 9021 and FRCP 58.

# # #

---

[5] *See* 11 U.S.C.A. § 349(b)(3) (dismissal revests property of estate in entity in which it was vested immediately before case was filed); 11 U.S.C.A. § 362(c)(1) & (2)(B) (stay against property of estate continues until property no longer property of estate, and stay of other acts continues until case is dismissed).

11